2008 VT 75

# Eugene F. Field, Jr. and Nancy N. Field v. Armando C. Costa, Maria F. Costa, Lorenzo P. Quesnel, Jr., Amy Quesnel, et al.

[958 A.2d 1164]

No. 07-005

Present: Johnson, Skoglund and Burgess, JJ., and Kupersmith, D.J., and Bent, Supr. J., Specially Assigned

Opinion Filed June 6, 2008

*Peter F. Langrock* and *Kevin E. Brown* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiffs-Appellants.

*James A. Dumont* of *Law Office of James A. Dumont, PC,* Bristol, for Defendants-Appellees Costa.

*James F. Carroll* of *English, Carroll, Ritter & Boe, P.C.,* Middlebury, for Defendants-Appellees Quesnel.

*James M. Cooley* of *Heilmann, Ekman & Associates, Inc.,* Burlington, for Defendants-Appellees Coldwell Banker Bill Beck Real Estate and Esty.

*Michael Marks* of *Tarrant, Marks & Gillies,* Montpelier, for Defendant-Appellee Vermont Land Trust.

¶ 1. **Skoglund, J.** Plaintiffs in this case are Nancy and Eugene Field, farmers from Connecticut who wanted to purchase a particular Vermont farm. Defendants are four independent parties including: the previous owners of the subject farm, Armando and Maria Costa; the current owners of the farm, Lorenzo and Amy Quesnel; a real estate agency and one of its brokers, Coldwell Banker Bill Beck Real Estate and Richard G. Esty (realtor); and the holder of a conservation easement on the farm, Vermont Land Trust, Inc. (Land Trust). This case involves a contractual dispute that arose after the Fields bargained to purchase the Costa farm, a farm subject to a conservation easement with a right of first refusal (ROFR) held in perpetuity by Land Trust. Land Trust exercised its ROFR to purchase the Costa farm and immediately assigned its interest to the Quesnels. The Fields then commenced this action, alleging breach of contract against the Costas and tortious interference against the other three defendants, and requesting specific performance by conveyance of the entire farm, along with punitive, contractual, and other damages. We affirm the superior court's grants of summary judgment in favor of all defendants on all claims.

¶ 2. The State of Vermont has long sought to preserve its rural landscape and natural-resource-based economy. As early as 1970, the Legislature created a statutory framework for transferring development rights from landowners to municipalities, state agencies, or qualified organizations. 10 V.S.A. §§ 6301-6309. Widely known as conservation easements, these transfers often come to rest with Land Trust, a nonprofit entity that partners with state agencies and other organizations in acquiring "those rights and interests which may be of no actual worth to the owner in light of his prospective use of his land but which represent a material

portion of the fair market value of the property." 1969, No. 229 (Adj. Sess.), § 1(c). Meanwhile, the owner retains some "rights and interests in [the] land, including the right of enjoyment and continuation of its present agricultural [use]." *Id.*

¶ 3. Land Trust entered into such an agreement in 2000 with Maria and Armando Costa, owners of a farm straddling the border of Whiting and Orwell, Vermont. The Costas transferred to Land Trust the "development rights, right of first refusal, and a perpetual conservation easement and restrictions" covering 296.5 acres of their farm. Another 10.1 acres of the Costa farm, on which were located the Costas' home, a garage, and a barn, were specifically excluded from the conservation easement. The specific restrictions placed on the 296.5-acre parcel (known as the "protected property") are not relevant to this case; suffice it to say that the primary purpose of the grant is to "conserve productive agricultural and forestry lands to facilitate active and economically viable farm use of the Protected Property now and in the future."

¶ 4. Of greater importance to this case are the details of the ROFR. The grant specifies that whenever the Costas "receive a written offer . . . to purchase all or any part of the Protected Property and [the Costas] accept said offer," the Costas must send a copy of the written offer by certified mail to Land Trust. Under the ROFR, Land Trust may then "elect to purchase the Protected Property at the offered price and upon such other terms and conditions not less favorable to [the Costas] than those contained in the conditionally accepted offer." Land Trust then has 90 days to exercise its ROFR, or the Costas may unconditionally accept the written offer and sell the protected property to any party. Any purchaser, of course, takes the land subject to the conservation easement held by Land Trust.

¶ 5. In 1994, long before the Costas conserved the bulk of their farm, they began leasing the protected property to neighboring dairy farmers, Lorenzo and Amy Quesnel. The Quesnels run a "large farm operation" requiring a special state permit under 6 V.S.A. § 4851, and they depend on the Costa farmland to spread manure from their home farm pursuant to the statute's requirement "to dispose of wastes in accordance with accepted agricultural practices." *Id.*

¶ 6. The plaintiffs in this case, Nancy and Eugene Field, also have an agricultural background, having raised "dairy replacements" — heifers raised to replace unproductive milking cows in

dairy operations — and operated a farm stand in Connecticut. The Fields actively searched for a Vermont farm, with plans to raise Christmas trees, pumpkins, and dairy replacements.

¶ 7. The Costas listed their farm for sale with realtor in July 2003. In early 2004, the Fields learned of the property and began communicating with realtor. The Costas and Fields signed a purchase-and-sale agreement for the entire farm, including both protected and unprotected property, on February 11, 2004. The Costas notified Land Trust by certified mail of the offer to purchase pursuant to the terms of the conservation easement and ROFR.

¶ 8. After several months of discussion between defendants, during which time the Fields' scheduled closing date came and went, Land Trust elected to exercise its ROFR and assigned its interest in the farm to the Quesnels. Land Trust gave the Costas the choice of having Land Trust either purchase only the protected property or the entire farm, including the 10.1 acres not covered by the ROFR. The Costas elected to have Land Trust purchase the entire farm. The Quesnels closed on the property in May 2004, and realtor returned the deposit check the next day to the Fields. The Fields then commenced this action.

¶ 9. All four defendants filed summary-judgment motions. In their motion, the Costas argued that the Fields knew of the conservation easement but did not inquire as to its details; that waiver of the ROFR was either an implied condition of the contract or that there was no meeting of the minds; and that the trial court could not reform the contract to create an agreement to sell only the 10.1 acres of unprotected property as the parties did not contemplate such a transaction. The court ruled that the ROFR was a condition precedent to the purchase agreement, and that Land Trust's failure to waive the ROFR made the purchase agreement unenforceable. The court further ruled that Land Trust's exercise of its ROFR voided the purchase agreement, and granted the Costas' motion for summary judgment.

¶ 10. In its own summary-judgment motion, Land Trust argued that its limited role in the underlying transaction — exercising its ROFR and assigning its interest in the land to the Quesnels — could not give rise to liability for tortious interference with contractual obligations. The court initially ruled that one factual allegation gave rise to a material dispute over whether Land Trust's actions constituted tortious interference: the Fields alleged

that a Land Trust representative told them they were "too old" to farm the land. Land Trust disputed this allegation and contended that the age of the potential purchasers played no part in their decision to exercise their ROFR. The trial court disagreed with Land Trust's characterization of the age comment as immaterial, and denied its motion for summary judgment. Land Trust then filed a second motion for summary judgment, characterizing the alleged statement as a "stray comment" that could not form the basis of an age-discrimination claim and that never factored into the ROFR decision. The Fields did not address the substantive legal arguments made by Land Trust, nor did they dispute the more detailed set of factual allegations set forth in Land Trust's second statement of material facts. The court granted Land Trust's second motion for summary judgment.

¶ 11. The Quesnels also filed a motion for summary judgment, arguing that they could not be found liable for tortious interference with the Fields' contractual rights because they acted in compliance with Land Trust's ROFR. Since the Fields alleged no ill will, malice, or improper motive beyond the allegation that the ROFR did not apply to unprotected property, the court granted the motion, consistent with its rulings in favor of the Costas. Specifically, the court ruled that exercising a ROFR cannot alone constitute tortious interference.

¶ 12. Finally, realtor moved for summary judgment, noting that the listing agreement specifically referenced a conservation easement, and that realtor orally informed the Fields of the ROFR. Realtor argued that the Fields therefore knew about the ROFR and that realtor could not be held liable for inducing or causing the Costas to breach their contract. The court denied this motion, ruling that a genuine issue of material fact existed regarding whether the Fields were informed of Land Trust's ROFR. Realtor then filed a second motion for summary judgment, arguing that the exercise of a lawful ROFR could not constitute tortious interference. The court granted realtor's second motion for summary judgment for the same reasons explained in its ruling on the Quesnels' motion. That is to say, that exercising a ROFR cannot alone constitute tortious interference.

¶ 13. The Fields appeal the grants of summary judgment in favor of all four defendants. We affirm, but with slightly different reasoning from that of the trial court. We also disagree with the Fields' contention that they acquired equitable title to, and are

therefore entitled to specific performance by conveyance of, the 10.1-acre, unconserved portion of the farm.

¶ 14. On appeal from summary judgment, we review all issues de novo using the same standard applied by the trial court. *Openaire, Inc. v. L.K. Rossi Corp.*, 2007 VT 120, ¶ 7, 182 Vt. 636, 940 A.2d 724 (mem.). "When a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." V.R.C.P. 56(e). We affirm grants of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3).

## I.

¶ 15. We begin with the claim of breach of contract against the Costas. We agree with the trial court that the Costas were entitled to summary judgment. However, while the trial court found that the Land Trust's failure to waive its ROFR *voided* the purchase agreement, we hold that the Costas did not breach the purchase agreement because the formation of the agreement was conditioned on Land Trust's waiver of its ROFR. Because the Land Trust validly exercised the ROFR, a contract for sale never formed.

¶ 16. It is undisputed that the Fields knew that a conservation easement burdened the Costa farm before they made an offer or signed the purchase agreement. The farm's sales listing sheet prepared by realtor described the standard details of the buildings and property — acreage, number of bedrooms, square footage, and other facts common to such listings. It specifically said "Dev. Rights sold on farm portion" and "Call [realtor] for packet on farm and dev. rights." Nancy Field averred that realtor also informed the Fields personally of the sale of the development rights during one of their early conversations about the property. Eugene Field admitted in deposition that he knew the property was subject to a conservation easement at the time they signed the purchase agreement.

¶ 17. Notwithstanding the existence and proper recordation of the conservation easement, the standard form purchase agreement made no reference to same. As we have held, "we consider an agreement as a whole when examining its individual provisions, 'but do not read terms into the contract unless they arise by necessary implication.' " *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 9, 177 Vt. 70, 857 A.2d 263 (quoting *Morrisseau v. Fayette*, 164 Vt. 358, 366-67, 670 A.2d 820, 826 (1995)). And we do not insert terms into an agreement by implication "unless the implication arises from the language employed or *is indispensable to effectuate the intention of the parties." Downtown Barre Dev.*, 2004 VT 47, ¶ 9 (emphasis added). Here, the conservation easement — which, even without the ROFR, significantly burdens the uses to which the property can be put — is a necessary part of any agreement to sell the property and is indispensable to effectuate the intention of the parties.

¶ 18. Because the conservation easement was an implied term of the purchase agreement, it follows that the ROFR contained in the easement also entered the contract by implication. With the evidence establishing that the Fields were aware that the property they wanted to buy was subject to a conservation easement, the Fields were put on inquiry notice to learn the full nature of the properly recorded easement.

¶ 19. The law is well-settled in Vermont and other jurisdictions that if a party to a contract has "sufficient facts concerning [another party's] interest in the property to call upon him to inquire, he is charged with notice of such facts as diligent inquiry would disclose." *Black River Assocs. v. Koehler*, 126 Vt. 394, 399, 233 A.2d 175, 179 (1967); see also *Fed. Sav. & Loan Ins. Corp. v. Urschel*, 157 P.2d 805, 810 (Kan. 1945) (notice of those facts that a reasonably diligent investigation would have unearthed is implied where there is knowledge of facts so informing that a prudent person would be prompted to inquire further). Faced with a similar factual scenario, a Texas court reasoned: "Although [plaintiff] maintains that it was not aware of the prior right of first refusal until it began negotiations to purchase the property . . . , any proper inquiry would have disclosed this adverse right. Since [an instrument concerning the property] was recorded and available for inspection, [plaintiff] is charged with constructive

notice of its contents." *Startex First Equip., Ltd. v. Aelina Enters., Inc.*, 208 S.W.3d 596, 602 (Tex. Ct. App. 2006).

¶ 20. This analysis also answers the Fields' claim that terms cannot be implied into contracts containing merger clauses. In so arguing, the Fields rely on the portion of the purchase agreement that stated that the contract "together with any written, signed addenda thereto, contains the entire agreement by and between Seller and Purchaser and supersedes any and all prior agreements, written or oral." Merger clauses are "designed to avoid the confusion created when parties may have several agreements or contracts between them prior to completing a written agreement." *Hoeker v. Dep't of Soc. & Rehab. Servs.*, 171 Vt. 620, 621, 765 A.2d 495, 498-99 (2000) (mem.). Here, we do not have several agreements or contracts between the Fields and the Costas. There is only the one purchase agreement that never took effect. *Ware v. Allen*, 128 U.S. 590, 595-96 (1888) ("We are of opinion that this [extrinsic] evidence shows that the contract upon which this suit is brought never went into effect; that the condition upon which it was to become operative never occurred . . . ."); see also *Kinnear & Gager Mfg. Co. v. Miner*, 88 Vt. 324, 330, 92 A. 459, 462 (1914) (Powers, C.J., dissenting) (accepting the rule of *Ware*).

¶ 21. Finally, the Fields argue that Land Trust never validly exercised its ROFR because the right only applies to the conserved portion of the farm, not the entire property, such that the purchase agreement, which covered the entire farm, did not trigger the ROFR. We reject this theory. A so-called "package deal" comes about when "an owner sells or attempts to sell property burdened by a right of first refusal as part of a larger package of properties." B. Daskal, Note, *Rights of First Refusal and the Package Deal*, 22 Fordham Urb. L.J. 461, 462 (1995). Courts have approached package deals differently depending on the procedural posture of the case. For example, in *Gyurkey v. Babler*, 651 P.2d 928 (Idaho 1982), the Idaho Supreme Court held that a package deal that included separate pricing on the burdened lot did not trigger a ROFR because it would be impossible for a preemptive rightholder to verify the precise price at which he was entitled to purchase the property. The court reasoned that any separate pricing of lots within the larger tract to be sold could "really be nothing more than an allocation of value in relation to the whole, rather than an independent offer on the included lot . . . since the true value of the lot rests in its

inclusion as part of the larger sale." *Id.* at 932. The court enjoined the owners from selling the burdened property until "they receive[d] an acceptable *bona fide* offer for [the burdened property] unrelated to the sale of any other property," and gave the ROFR holder the appropriate notice and opportunity to meet such offer pursuant to the right of first refusal. *Id.* at 934. In *Capalongo v. Giles*, 425 N.Y.S.2d 225, 228 (Sup. Ct. 1980), *rev'd in part on other grounds*, 438 N.Y.S.2d 638 (App. Div. 1981), a New York trial court held that a package deal did trigger a ROFR. It rescinded conveyance of a parcel that included a burdened tract and ordered specific performance of the parcel to the ROFR holder. Finally, the Kansas Supreme Court, in *Anderson v. Armour & Co.*, 473 P.2d 84, 89 (Kan. 1970), awarded contract damages to the ROFR holder after the owner conveyed a parcel that included a burdened tract without first notifying the ROFR holder.

¶ 22. However differently courts may approach the issue, they are consistent in protecting the interests of the ROFR holder over the rights of the prospective buyer. *Gyurkey*, 651 P.2d at 932; *Capalongo*, 425 N.Y.S.2d at 228; *Anderson*, 473 P.2d at 89. "To allow the owner of the whole to by-pass the optionee merely by attaching additional land to the part under option would render nugatory a substantial right which the optionee had bargained for and obtained." *Guaclides v. Kruse*, 170 A.2d 488, 495 (N.J. Super. Ct. App. Div. 1961). We hold that, in this case, a "package deal" including both encumbered and unencumbered property triggered the ROFR.

¶ 23. In sum, we hold that because the Fields had actual notice of the conservation easement and inquiry notice of the ROFR, a contract for sale was never formed. We further hold that the Fields' offer to purchase the protected and unprotected parcels as a whole triggered the ROFR. Therefore, the Costas were properly granted summary judgment.

## II.

¶ 24. We turn next to the Fields' claims of tortious interference with contract against defendants Land Trust, realtor, and the Quesnels, addressing each in turn.

¶ 25. In order to establish Land Trust's liability for tortious interference, the Fields must show that Land Trust "intentionally and improperly induced" the Costas "not to perform [their]

contract." *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612, 686 A.2d 472, 473 (1996) (mem.). In determining what actions are "improper," we evaluate the tortious-interference claims as applied to prospective contractual relations since, as shown above, the Fields and the Costas never consummated their purchase agreement. "Our analysis of this issue is guided by § 767 of the Restatement (Second) of Torts (1979), which directs us to consider the motives and actions of [defendant], the relations of the parties, and their respective interests." *Id.* at 612, 686 A.2d at 474.

¶ 26. While we have never ruled on the question of whether a party's valid exercise of its ROFR may constitute tortious interference with contractual obligations, we are persuaded by other jurisdictions that have held that it cannot, at least absent malice or ill will. In *Blair v. General Motors Corp.*, a federal district court held that exercising a ROFR is merely the assertion of a contractual right, and absent any "ill will" or "wrongful motive," the exercise cannot constitute tortious interference. 838 F. Supp. 1196, 1200-01 (W.D. Ky. 1993); see also *Backus v. Smith*, 364 So. 2d 786, 787 (Fla. Dist. Ct. App. 1978) (holding that, absent malice, unsuccessful condominium purchasers were unable to maintain action in tortious interference with contractual obligations against condominium association, which exercised its ROFR to defeat purchase). The Fields have shown no evidence that Land Trust acted with ill will or malice. We hereby adopt the rule followed by these other jurisdictions that exercising a valid ROFR cannot form the basis of a tortious interference claim absent ill will or malice.

¶ 27. Applying the standards under § 767 of the Restatement (Second) of Torts, which we have previously used in tortuous-interference cases, see *Gifford*, 165 Vt. at 612, 686 A.2d at 474; *Mitchell v. Aldrich*, 122 Vt. 19, 24, 163 A.2d 833, 837 (1960) ("All the circumstances must be analyzed and considered with reference to the type of relation disrupted, the means employed and the purpose of the actor's interference."), and taking this evidence in the best light for the Fields, we conclude that the motives and actions of Land Trust were fully within the bounds of their contractual rights set forth in the conservation easement. The Fields allege Land Trust acted with malice by: not telling the Fields of the ROFR prior to their signing the purchase agreement; engaging in secret negotiations with the Quesnels, including

structuring an agreement to properly time the closing and recordation in town offices; and exercising its ROFR for discriminatory reasons. The Fields point to the fact that Land Trust had the Quesnels sign an indemnification agreement as evidence of Land Trust's consciousness of the wrongfulness of its actions. The first two of these allegations of malice have no merit whatsoever. As noted, the Fields were on inquiry notice as to the existence of the ROFR. Furthermore, Land Trust held a ROFR on the property and would have been within its contractual rights in negotiating with the other defendants either secretly or publicly or both. *Office Machs., Inc. v. Mitchell*, 234 S.W.3d 906, 908 (Ark. Ct. App. 2006) ("[A] defendant seeking to [protect his business interests] . . . may . . . enter into secret negotiation behind the plaintiff's back . . . without incurring liability [for tortious interference].").

¶ 28. This leaves only the claim that a Land Trust employee allegedly told the Fields they were too old to farm. Land Trust dismissed this statement as a "stray comment" that had nothing to do with the process of deciding whether it should exercise the ROFR. At oral argument, the Fields claimed that the comment was not a stray remark, and that it should have survived summary judgment and been put before a trier of fact. In Land Trust's second motion for summary judgment, the statement of undisputed facts states that Land Trust exercised its ROFR because it wanted to keep the land in active dairying, and that an immediate transfer of the protected land to the Quesnels would meet that objective, while the Fields had no plans to run an active dairy operation. Additionally, Land Trust realleged that age played no part in its decision to exercise the ROFR. The Fields did not dispute these factual allegations. Because the Fields filed no responsive statement, the facts set forth in Land Trust's statement are "deemed to be admitted." V.R.C.P. 56(c)(2). We do not disturb the trial court's ruling.

¶ 29. We next turn to the claim of tortious interference against the Quesnels. The Fields argue that the Quesnels induced the Costas to breach their purchase agreement with the Fields in an effort to enhance their existing dairy operation. However, the Quesnels merely took an assignment from Land Trust, which exercised its valid, legal ROFR. As stated above, the exercise of a ROFR does not constitute tortious interference with contractual

relations absent ill will, malice, or other improper motive. Since the Fields point to no facts that bear on any of these elements, we conclude that the Quesnels did not tortiously interfere with the purchase agreement.

¶ 30. Finally, we evaluate the charge of tortious interference against realtor. The Fields argue that realtor tortiously interfered with the purchase agreement by holding on to the Fields' $4,000 deposit check even after realtor knew that the Quesnels would be taking title to the entire farm. They further argue that realtor knew the Quesnels were closing on the farm, but failed to tell the Fields, and that these acts were impermissible efforts to protect its sales commission. We disagree that these actions constituted malice or ill will on the part of realtor. In fact, realtor sent the Fields a letter the day after the closing, returning their deposit. Since we have previously noted that Land Trust had a right to negotiate in secret, and because realtor had no obligation to inform the Fields of the defendants' intentions, the Fields cannot rely on the secrecy of these negotiations to form the basis of a tortious interference claim against realtor. The trial court was correct in granting realtor's motion for summary judgment.

## III.

¶ 31. Finally, we turn to the Fields' contention that they acquired equitable title to the 10.1-acre, unconserved portion of the farm, notwithstanding their ambivalence towards acquiring only the unprotected property during the proceedings in the trial court. This argument also fails. The Fields, as noted, never had any contractual rights to the entire farm, as the contract was conditioned on Land Trust waiving its ROFR, which it did not do. By extension, the Fields had no contractual rights to any portion of the farm. Further, their complaint sought specific performance by conveyance of the entire farm, not solely of the unprotected property. The Fields did not make any offers for the smaller tract during the three-month period after they learned of Land Trust's ROFR and before the Quesnels closed. Moreover, Eugene Field admitted in deposition that he "[didn't] want ten acres" and that he never authorized any offer to purchase only the unprotected property. It is clear, then, that no party to this litigation desired or sought a separate contract for only the unprotected 10.1-acre

parcel, nor was a contract strictly for the 10.1-acre parcel ever discussed or formed. The trial court was thus correct to not award specific performance by conveyance of the 10.1 acres, as the Fields did not acquire equitable title to it.

¶ 32. For the foregoing reasons, we affirm the trial court's decision granting summary judgment in favor of all defendants.

*Affirmed.*